IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JEFF MCDONOUGH as Durable Power )<br>Of Attorney for JEAN M. MCDONOUGH )<br><u>Address</u> )<br>11223 Holly St )<br>Kansas City, MO 64114 )<br> )<br>      Plaintiff, )<br> )<br>vs. )<br> )<br> )<br> )<br>BROOKDALE SENIOR LIVING )<br>COMMUNITIES, INC. )<br><u>Serve Registered Agent</u> )<br>Corporation Service Company )<br>2900 SW Wanamaker Drive Suite 204, )<br>Topeka, KS 66614 )<br> )<br>BROOKDALE SENIOR LIVING INC. )<br><u>Serve Registered Agent:</u> )<br>Corporation Service Company )<br>251 Little Falls Drive )<br>Wilmington, DE 19808 )<br> )<br> )<br>      Defendants. ) | Case No.<br><br>Jury Trial Demanded |

<u>COMPLAINT</u>

COMES NOW Plaintiff Jeff McDonough as the durable power of attorney for Jean M. McDonough ("Resident") for his causes of action against the above-named defendants, states and alleges as follows:

## PLAINTIFF

1.      Resident is a Kansas resident and was a resident of Brookdale Senior Living Communities, Inc d/b/a Brookdale Leawood State Line located at 12724 Stateline Road Leawood, KS 66209 ("OPERATOR").

2.      RESIDENT was hit and/or kicked by another resident on multiple occasions prior to October 30, 2018.

3.      On October 30, 2018, this same resident referenced in the above paragraph pulled RESIDENT down to the ground in a violent manner and, as a result, RESIDENT broke her hip.

4.      The previous altercations between RESIDENT and the other resident made the October 30, 2018, altercation foreseeable and preventable.

5.      Since October 30, 2018, RESIDENT has been immobile, and wheelchair bound.

6.      Prior to October 30, 2018, RESIDENT was able to walk and ambulate independently.

7.      Resident is permanently injured due to defendants' conduct described above.

### Brookdale Senior Living Communities, Inc ("OPERATOR")

8.      OPERATOR is a Delaware limited liability company.

9.      At all times relevant, OPERATOR, owned, operated, managed, maintained, and/or controlled, in whole or in part, OPERATOR.

10.     Consequently, OPERATOR, owed a duty to RESIDENT to use reasonable care for her safety while under its care and supervision at OPERATOR, and breached said duty for all the reasons described above and below.

**Brookdale Senior Living Inc ("OWNER")**

11.     At all times relevant to this action, Defendant OWNER was a Delaware company and engaged in providing ancillary medical services to persons requiring such services, including RESIDENT, by owning, operating, managing, maintaining, and controlling OPERATOR.

12.     At all times relevant to this action, OWNER, and/or individuals or entities acting on its behalf, operated, managed, maintained, and/or controlled, in whole or in part, OPERATOR.

13.     OWNER, and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled OPERATOR by exercising final authority over:  staffing budgets; the development and implementation of nursing policies and procedures; the hiring and firing of the administrator; and appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of OPERATOR.

14.     These actions and business decisions had a direct impact on the care provided to all residents including RESIDENT.

15.     OPERATOR is the alter ego of OWNER.

16.     Consequently, OWNER owed a duty to RESIDENT to use reasonable care for her safety while under its care and supervision at OPERATOR and breached said duty for all the reasons described above and below.

17.     OWNER can be served through its registered agent above.

## DEFENDANTS' JOINT ENTERPRISE/VENTURE

18.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows.

19.     Defendants were engaged in a joint enterprise in that:

a.   Defendants had an agreement, express and/or implied, among the members of the group to operate OPERATOR which is a Kansas licensed nursing home;

b.   Defendants had a common purpose to operate OPERATOR which is a Kansas licensed nursing home;

c.   Defendants had a community of pecuniary interest in the operation of OPERATOR which is a Kansas licensed nursing home; and

d.   Defendants had an equal right to a voice in the direction of the operation of OPERATOR, which is a Kansas licensed nursing home, which gave the Defendants an equal right of control.

20.     There has been a close relationship between the Joint Venture/Enterprise Defendants at all times relevant.

## JURISDICTION AND VENUE

21.     Plaintiff incorporates by reference all of the foregoing allegations in this Complaint as though fully set forth herein.

22.     RESIDENT is a resident of Kansas.

23.     Defendants are each foreign entities as described above, and thus residents of states other than Kansas.

24.     Therefore, RESIDENT brings her claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

4

25.     Pursuant to K.S.A. § 60-308(b)(2), defendants purposefully availed themselves of the protections and/or benefits of the laws in Kansas by conducting business and committing tortious acts within the state including, but not limited to, failing to ensure that OPERATOR had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

26.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in Kansas, thereby making venue proper in this Court.

<u>AGENCY</u>

27.     Plaintiff incorporates by reference the allegations previously set forth and further allege as follows.

28.     The acts hereinafter described were performed by the agents, representatives, servants, and employees of defendants and were performed either with the full knowledge and consent of defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the defendants.

29.     Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

<u>RESIDENT'S TREATMENT AT OPERATOR</u>

30.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows.

31.     During RESIDENT's time at OPERATOR none of the staff implemented or provided the appropriate interventions to prevent RESIDENT from being attacked by another resident and/or prevent falls.

32.     In addition, the OPERATOR's staff did not monitor RESIDENT and keep her safe and separated from any resident who might harm her.

33.     At no point while Resident was a resident at OPERATOR did any of OPERATOR management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from OWNER, or any other staff member ever provide any sort of in-service training or clinical education to OPERATOR staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of physical altercations and/or falls in residents like RESIDENT.

34.     At no point while RESIDENT was a resident at OPERATOR did any of OPERATOR management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from OWNER, or any other staff member ever implement the appropriate policies and procedures at OPERATOR regarding the assessment, prevention, use of interventions, monitoring, and reporting of physical altercations and/or falls in residents like RESIDENT.

35.     While RESIDENT was a resident at OPERATOR, OPERATOR did not have an adequate amount of staff working on a daily basis at OPERATOR to meet RESIDENT's needs; perform the interventions required to prevent altercations and/or falls; and monitor and adequately supervise RESIDENT's condition.

## MANGAGEMENT OF OPERATOR

Undercapitalization/Underfunding at OPERATOR

36.     OWNER and OPERATOR had a duty to provide financial resources and support to OPERATOR  in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

37.     OWNER and OPERATOR had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

38.     OPERATOR had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

39.     No individuals at OPERATOR are involved in decision making about the financial operations or what its resources were and where they would be spent.

40.     Transactions directed by OWNER left OPERATOR with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during RESIDENT'S time there

### LEGAL BASIS' FOR OWNER AND OPERATOR's LIABILITY

OWNER and OPERATOR's Liability for Acting/Operating in a Joint Venture/Joint Enterprise

41.     OWNER and OPERATOR directed, operated and managed the day to day functions of their nursing facilities – including OPERATOR – by developing and implementing policies, practices and procedures affecting all facets of the facility, including resident care.

42.     These policies manipulate and control the physical and financial resources, and prohibit decision making at the facility level.

43.     This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much and staff is available to provide resident care and how well trained and supervised are they to meet the needs of the residents.

44.     These policies were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of OPERATOR's residents.

45.     OWNER and OPERATOR affirmatively chose and decided to establish such operations and demand they be implemented. Such operations included, inter alia, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when defendants had already chosen to understaff the facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain patients whose needs exceeded the qualification and care capability of the facility's staff.

46.     OWNER and OPERATOR consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

47.     OWNER and OPERATOR conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit: the shared interest in the operation and management of nursing facilities; the express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and the obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing nursing facilities.

48.    Kansas law recognizes a Joint Venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

49.    OWNER and OPERATOR share a common interest in the operation and management of nursing facilities, including OPERATOR; maintain agreements to share in the profits or losses of the operation of nursing facilities described herein; and operate on a daily basis evincing conduct which indicates their cooperation in the venture of operating and managing nursing facilities for profit.

50.    OWNER and OPERATOR took direct, overt and specific actions to further the interest of the joint enterprise.

51.    These actions were taken through a joint venture/enterprise or through OWNER and OPERATOR and their officers, directors, managers and or employees.

52.    OWNER and OPERATOR had an equal right to share in the profits and to bear liability for, the Joint Venture/enterprise.

53.    Further, because OWNER and OPERATOR were dominated by each other, these entities had an equal right to direct or control their venture as a whole, as well as to direct or control the operation and management of OPERATOR.

Direct Participation/Individual Actions

54.    OWNER and OPERATOR were at all times material to this lawsuit in the business of managing, owning and operating a network of assisted living facilities throughout the State of Kansas. One such assisted living facility was OPERATOR where RESIDENT was admitted for care and treatment.

55.     At all times material to this lawsuit, OWNER was fully aware that the delivery of essential care services in each of their assisted living facilities – including OPERATOR – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within OPERATOR; and, (3) payor mix.

56.     At all times material, OWNER made critical operational decisions and choices which manipulated and directly impacted OPERATOR's revenues and expenditures.   More particularly, OWNER determined:

      a.   the number of staff allowed to work in their chains of assisted living facilities including OPERATOR;

      b.   the expenditures for staffing at facilities including OPERATOR;

      c.   the revenue targets for each assisted living facility including OPERATOR;

      d.   the payor mix; and, census targets for each assisted living facility including OPERATOR,

      e.   patient recruitment programs and discharge practices at each assisted living facility including OPERATOR.

57.     All cash management functions, revenues and expenditure decisions at OPERATOR were tightly managed, directed, and supervised by OWNER.

58.     It was the choices made by OWNER which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including OPERATOR.

59.     OWNER formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels and payor mix.

60.     The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by OWNER were implemented and such application was carefully supervised and enforced.

61.     Following the mandates, OPERATOR functioned in accordance within them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as OWNER deemed appropriate.

62.     Accordingly, such manipulation by OWNER as to staffing and census were motivated by the financial needs of OWNER and OPERATOR as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

63.     Instead of abiding by their duty to care for the residents, OWNER and OPERATOR chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

64.     OWNER and OPERATOR therefore, directly participated in a continuing course of negligent conduct, requiring OPERATOR to recruit and retain heavier care, higher pay residents to the facility even though the needs of the patient population far exceeded the capacity of staff.

65.     At the same time, OWNER and OPERATOR chose to design, create, implement and enforce operational budgets at OPERATOR which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

66.     In so doing, OWNER and OPERATOR disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case OPERATOR, by the State of Kansas and the federal government.

Corporate Malfeasance

67.     OWNER and OPERATOR consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

68.     Accordingly, OWNER and OPERATOR by their operational choices and decision making, and in order to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

69.     These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the state of Kansas and federal government imposed upon OWNER and OPERATOR, including OPERATOR.

70.     Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents ay OPERATOR including RESIDENT, failed to receive even the most basic care required to prevent catastrophic injury.  This negligence and resulting injuries ultimately led to and caused RESIDENT's injuries.

71.     Specifically, the lack of adequate staff resulted in:

   a.   lack of supervision of nursing aides thereby causing RESIDENT's altercations and/or falls

   b.   lack of supervision of nursing aides and LPNs, thereby permitting staff to improperly develop a care plan and implement interventions for altercations and falls

   c.   lack of registered nurses to train staff regarding proper responses to RESIDENT's risk for altercations and/or falls;

   d.   lack of registered nurses to train staff regarding implementing interventions for altercations and/or falls

   e.   lack of registered nurses to appropriately assess RESIDENT'S risk for altercations and/or falls.

72.     During RESIDENT's residency at OPERATOR, RESIDENT sustained physical injuries as a result of the acts, omissions, decisions and choices made by OWNER and OPERATOR in operating OPERATOR.

73.     During RESIDENT's residency at OPERATOR, OWNER and OPERATOR negligently failed to provide and/or hire, supervise and/or retain staff capable of providing RESIDENT with a clean, safe and protective environment, and that, as a result of this failure, RESIDENT suffered neglect, abuse, severe personal injuries, conscious pain and suffering, deterioration of RESIDENT'S physical condition, and deterioration of RESIDENT'S quality of life.

74.     OWNER and OPERATOR manage, operate and direct the day to day operations of OPERATOR and these OWNER and OPERATORs are liable for this direct involvement in the operations. These OWNER and OPERATOR are therefore liable to the Plaintiff for the neglect of, injuries to RESIDENT.

75.     OWNER and OPERATOR are sued for their direct participation in the torts and causes of action made the basis of this lawsuit, having:

a.  chosen to disregard the duties and responsibilities which OPERATOR, as a licensed nursing home, owed to the State of Kansas and its residents;

b.  created the dangerous conditions described by interfering with and causing OPERATOR to violate Kansas statutes, laws and minimum regulations governing the operation of said nursing home;

c.  superseding the statutory rights and duties owed to assisted living facility residents by designing and mandating dangerous directives, policies, management and day to day operation of OPERATOR;

d.  caused the harm complained of herein; and

e.  choosing to disregard the contractual obligations owed to the State of Kansas and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

<u>COUNT I</u>

**Plaintiff's Negligence Claims Against the Defendants**

76.     Plaintiff incorporates by reference all of the foregoing allegations in this Complaint as though fully set forth herein.

77.     As a result of her defenseless and dependent condition, RESIDENT relied upon the Defendants to provide for his safety, protection, care and treatment.

78.     At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

79.     These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

80.     These duties required Defendants to have sufficient and qualified staff at OPERATOR to ensure the proper care for, and treatment of all residents including Resident.

81.     These duties required Defendants to ensure that OPERATOR's nurses and other staff were properly educated and trained with regard to the care for, and treatment of all residents including Resident.

82.     These duties required Defendants to ensure that OPERATOR was properly capitalized to ensure the proper care for, and treatment of all residents including Resident

83.     Specifically, during the course of their care and treatment of Resident, Defendants and their agents, servants and/or employees breached their duty and were guilty of the following acts of negligence and carelessness by failing to measure up to the requisite standard of due care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including:

a.  By failing to adequately assess, monitor, document, treat, and respond to RESIDENT's physical condition;

b.  By failing to timely, consistently, and properly assess and document RESIDENT's physical condition;

c.  By failing to provide adequate nursing staff to ensure RESIDENT's 24-hour protective oversight and supervision;

d.  By failing to provide adequate assistive devices to prevent injuries;

e.  By failing to carry out the instructions of RESIDENT's physician;

f.  By failing to adequately, timely and consistently prevent, altercations and physical attacks;

g.  By failing to timely transfer RESIDENT to a facility that could provide his adequate care;

h.  By failing to provide adequate staff to ensure  RESIDENT's 24-hour protective oversight, supervision and care;

i.  By failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of RESIDENT;

j.  By failing to have and/or implement appropriate polices and procedures regarding the prevention of physically attacks;

k.  By failing to consistently monitor, assess, and document  RESIDENT's physical condition;

l.  By failing to adequately assess RESIDENT's risk of being physically attacked;

m.  By failing to carry out and follow standing orders, instructions and protocol regarding the prevention of physically attacks;

n.  By failing to ensure that RESIDENT received proper care and treatment to prevent physically attacks;

o.  By failing to have a sufficient number of staff; and

p.  By failing to ensure OPERATOR was properly capitalized.

84.     As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident suffered severe pain, anxiety, mental distress, and permanent injury and disability.

85.     The actions of Defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

86.     At the time Defendants caused and allowed RESIDENT's avoidable altercations and/or falls and fractured hip, they knew that their conscious disregard to provide adequate staff; properly capitalize OPERATOR; train, and/or supervise their agents, servants and/or employees during 2019 created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

87.     Accordingly, Defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against Defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

88.     As a direct and proximate result of Defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; permanent injury and disability; and other damages.

89.     Plaintiff Resident is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution and *Jones v. United Parcel Services, Inc.* No. 09–3275 (10th Cir. 2011).

WHEREFORE, Plaintiff Resident prays that the Court enter judgment against defendants for a reasonable sum of money in excess of seventy-five thousand dollars ($75,000) for actual and punitive damages together with the costs and expenses herein occurred, attorneys' fees and for such other relief as this Court deems just and proper.

## COUNT II
### Alter Ego Against Brookdale Senior Living, Inc ("Alter Ego Defendant")

90.    Plaintiff incorporates by reference all of the foregoing allegations in this Petition as though fully set forth herein.

91.    OPERATOR is so dominated by the Alter Ego Defendant that OPERATOR is a mere instrument of Alter Ego Defendant and is indistinct from Alter Ego Defendant.

92.    In fact, OPERATOR is so controlled and influenced by the Alter Ego Defendant in that they exercised complete control and domination over OPERATOR finances and business practices.

93.    Specifically, the Alter Ego Defendant complete control and domination over OPERATOR caused its undercapitalization and understaffing during 2019 and Resident's residency.

94.    Upon information and belief, the Alter Ego Defendant complete control and domination over OPERATOR caused it to operate at a loss during the the year of this incident and previous two years.

95.    Upon information and belief, the Alter Ego Defendant complete control and domination over OPERATOR caused its liabilities to exceed its assets during the the year of this incident and previous two years.  Specifically,

a.  The Alter Ego Defendant owns all or most of the capital stock of OPERATOR;

b.  The Alter Ego Defendant and OPERATOR have common directors or officers;

c.  The Alter Ego Defendant finances OPERATOR;

d.  The Alter Ego Defendant subscribes to all of the capital stock of OPERATOR;

e.  The Alter Ego Defendant caused the incorporation of OPERATOR;

f.  OPERATOR has grossly inadequate capital;

g.  The Alter Ego Defendant pays the losses of OPERATOR;

h.  The Alter Ego Defendant use the property of OPERATOR as its own; and

i.  The directors or executives of OPERATOR do not act independently in the interest of OPERATOR but take their orders from the Alter Ego Defendant in the latter's interest.

96.     Thus, the Alter Ego Defendant used the corporate cloak of OPERATOR as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that the Alter Ego Defendant complete control and domination of OPERATOR depleted all of OPERATOR's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

97.     This undercapitalization and understaffing violated OPERATOR's duties and the applicable standard of care owed by am assisted living facility operator or manager to the facility's residents.

98.     As a direct and proximate result of the individual and collective acts of negligence of OPERATOR – and the Alter Ego Defendant – Resident suffered severe pain, anxiety, mental distress, and permanent disability and injury.

99.     The actions of OPERATOR – and the Alter Ego Defendant – were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

100.    At the time OPERATOR – and the Alter Ego Defendant – caused and allowed Resident avoidable altercations and/or falls and fractured hip, knew that their conscious disregard to provide adequate staff and properly capitalize OPERATOR during 2019 high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

101.    Accordingly, OPERATOR – and the Alter Ego Defendant – showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

102.    As a direct and proximate result of OPERATOR – and the Alter Ego Defendant – negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; permanent disability and other damages.

103.    Plaintiff Resident is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution and *Jones v. United Parcel Services, Inc.* No. 09–3275 (10th Cir. 2011).

WHEREFORE, Plaintiff prays that the Court enter judgment against defendants for a reasonable sum of money in excess of seventy-five thousand dollars ($75,000) for actual and punitive damages together with the costs and expenses herein occurred, attorneys' fees and for such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on all issues in this action in Kansas City.

Respectfully submitted,

STEELE CHAFFEE, LLC

/s/ Jonathan Steele
Jonathan Steele          KS # 24852
2345 Grand Blvd, Suite 750
Kansas City, MO 64108
Telephone (816) 466-5947
E-mail:  jonathan@nursinghomeabuselaw.com

**ATTORNEY FOR PLAINTIFF**

20